IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RANDY CORNELIUS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06-CV-312-WKW [WO] |
| | ) | |
| CITY OF ANDALUSIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are two motions for summary judgment, one filed by Defendant Keith Kipp ("Officer Kipp") (Doc. # 71), and the other by Defendant Andy Willis ("Willis") (Docs. # 79). Each motion is accompanied by a brief. (Docs. # 72 & 80.) Plaintiff Randy Cornelius ("Cornelius") filed a response to Officer Kipp's motion. (Doc. # 82.) The motions are thus ripe for resolution. Based upon careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the motions for summary judgment are due to be granted.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a). The parties do not contest personal jurisdiction or venue, and there are allegations sufficient to support both.

## II. FACTUAL AND PROCEDURAL BACKGROUND

**A.  Factual Background**

Cornelius is suing Willis, a private citizen, and Officer Kipp, a game warden,[1] for incidents that occurred the night of November 13, 2004, when the police and Officer Kipp stopped Cornelius on his way back into town after a day of hunting.[2]  Cornelius was bow hunting on property he leased outside the City of Andalusia, Alabama.[3]  With him was Casey Johnston ("Johnston"), the son of a longtime customer of Cornelius's barber shop.  Cornelius and Johnston were hunting separately that day.  When it was almost dark, Cornelius turned off a public road and onto a road that ran along a sewer-line on the leased property, picked Johnston up, and drove back out toward the public road.[4]

On their way back out, Cornelius and Johnston confronted a pick-up truck positioned near the intersection of the sewer-line right-of-way and the public road.  Willis was driving

---

[1] Officer Kipp is an officer with the Alabama Department of Conservation.

[2] A few prefatory notes on citations: (1) specific record citations are provided for disputed facts or if needed for clarity; (2) the facts are viewed in the light most favorable to the nonmovant, Cornelius (see Standard of Review infra); and (3) the complaint has gone through several iterations (see Docs. # 1, 16, 58), but it is the Second Amended Complaint (Doc. # 58) that governs.

[3] Cornelius technically did not have a lease with the property owner.  Cornelius had an arrangement with the lessee whereby Cornelius paid him a fee.  (Cornelius Dep. 32-33, Oct. 9, 2008 (Mot. Summ. J. Br. Kipp Ex. 1).)  For the sake of convenience, the arrangement is referred to as Cornelius's leasing the property.

[4] The exact time of night when they drove back out is unclear and in dispute.

the truck.[5]  In his deposition, Cornelius testified that the truck was blocking the right-of-way.

(Cornelius Dep. 18-19, Oct. 9, 2008 (Mot. Summ. J. Br. Kipp Ex. 1).)  In his words,

> I went to pick [Johnston] up, come back out to the road, and there was a car that had me blocked in where I couldn't get out.
> . . . .
> It was a truck, I believe.  And it was – had the driveway blocked.  I rolled my window down and said, Hey, man what are you doing?
> He said, what you doing?
> I said I'm hunting; why? He didn't say nothing.  I sit there a little while, and he didn't never move or anything.  So I just pulled down in the ditch and around him.  And I got out of the – I stopped the car, and I got out of the car. I was going to walk back there and ask him what was going on, and he just backed further down the road.

(Cornelius Dep. 18, 19-20.)  Cornelius then returned to his car and headed back to town.

Once inside the city limits, the police and Officer Kipp pulled Cornelius over.  How he was pulled over is unclear.  During his deposition, Cornelius at first testified that he could not remember if the police stopped him by pulling in front or in back of his car.  (Cornelius Dep. 96.)  After reading an affidavit attached to his notice of claim and executed on December 13, 2004, however, Cornelius recalled that when he was driving back into town, the police cars were blocking the road and facing him.  (Cornelius Dep. 113-16.)  Cornelius claims that after stopping his car, the police ran up to his car window, pointed a gun at him, told him to get out of the car and to put his hands above his head.[6]  (Cornelius Dep. 22.)  He asked one officer, who was holding the gun and pointing it to his head, to remove the gun

---

[5] Willis testified that two other people were in the truck with him.  (Willis Dep. 38, Oct. 9, 2008 (Mot. Summ. J. Br. Willis Ex. 4).)  Cornelius did not know Willis at the time.

[6] He remembers two officers pointing a gun at him, one for a long time.  (Cornelius Dep. 100.)

3

from his face.  (Cornelius Dep. 22-23.)  Cornelius testified that the officer was shaking his gun.[7]  (Cornelius Dep. 22-23.)  Cornelius testified that the officers also asked Johnston to get out of the car  (Cornelius Dep. 24), though Johnston claims he was never ordered out of the car (Johnston Aff. ¶ 11 (Resp. Ex. 4)).  According to Cornelius's version of events, Officer Kipp then asked Cornelius to step to the back of the car (Cornelius Dep. 25), laid him over the trunk, put his hands behind him, and handcuffed them (Cornelius Dep. 119).  After Cornelius asked why he was being arrested, Officer Kipp told him that he was not being arrested but being detained for poaching.  (Cornelius Dep. 25-26.)  Cornelius then asked how one could poach on his own land, and told Officer Kipp about his lease to hunt there.  (Cornelius Dep. 26.)  Officer Kipp made a phone call, and found out that the land was leased to Cornelius.  (Cornelius Dep. 27.)  He unclasped Cornelius's handcuffs, apologized to Cornelius, and allowed him to leave the scene of the stop.  (Cornelius Dep. 29.)  Thusly, the encounter ended.

At some point during the detention, the police officers or Officer Kipp searched the car even though Cornelius told them he and Johnston had no guns.[8]  (Cornelius Dep. 29.) Cornelius stated that the search involved opening doors and looking in the car with flashlights, but that the officers did not get into the car or look under the seats, open the glove

---

[7] Once Cornelius was in handcuffs, the police stopped pointing guns at him.  (Cornelius Dep. 39.)

[8] Cornelius gave conflicting answers as to whether the officers asked for consent to search.  (*See* Cornelius Dep. 120.)

compartment, or open the trunk.  (Cornelius Dep. 30-31.)  Cornelius testified that the detention lasted fifteen to twenty minutes, though "[m]aybe longer[,] . . . like two hours[,]" but that he "didn't know how long it was to be honest."  (Cornelius Dep. 28.)[9]

The stop and detention were initiated by a series of phone calls Willis made to Officer Kipp that evening.  Officer Kipp and Willis are, in Officer Kipp's words, "good friends." (Kipp Dep. 72, Oct. 9, 2008 (Mot. Summ. J. Br. Kipp Ex. 2).)  They have hunted together in the past, but Officer Kipp testified that he and Willis did not hunt together in the 2004 hunting season on the property near Cornelius's leased land.  (Kipp Dep. 16.)

On November 13, 2004, Willis was hunting on property across the road from the sewer-line right-of-way.  When he finished hunting and was driving away, he noticed a car turning left onto the sewer-line road.[10]  (Willis Dep. 25, Oct. 9, 2008 (Mot. Summ. J. Br. Willis Ex. 4).)  The car he observed drove around a curve and out of sight.  (Willis Dep. 28.) Willis then called Officer Kipp and told him that a suspicious car had turned onto the right-of-way.[11]  (Willis Dep. 28, 42.)  Willis testified that he was suspicious because it was a car he did not recognize, turning onto a private right-of-way, the land's lessor had told Willis earlier that year that no one was supposed to be on the land, and Willis had observed other

_____

[9] Johnston's affidavit corroborates Cornelius's testimony.

[10] Willis claims that it was after dark when he saw the car turning left.  (Willis Dep. 25.)

[11] Officer Kipp was out of uniform at home when Willis called.  Officer Kipp dressed in his uniform, and asked for assistance from the police when he started driving to the location.  (Kipp Dep. 26.)

illegal activities, such as dumping, in that area before and had reported them.  (Willis Dep. 32-34.)

Willis remained on the main road near the intersection and the right-of-way.  When the car came back around the curve, Willis testified that he noticed a light shining out of the passenger side window.[12]  (Willis Dep. 35-36.)  He confronted Cornelius.  Willis testified that his truck, though near the right-of-way, was not "obstructing [Cornelius's] exit" and that Cornelius "pulled right beside [him]" in his car so that the driver's side doors of both cars were side by side.  (Willis Dep. 37.)  They had their conversation,[13] Cornelius drove off, and Willis followed him.  (Willis Dep. 40-41.)  Willis drove in the same direction behind Cornelius (Willis Dep. 40) and called Officer Kipp again, giving him a description of the car (including the shining light), the direction in which it was traveling, and the encounter between Willis and Cornelius.  (Willis Dep. 54, 57.)  Officer Kipp testified that he took Willis's statement to be "trustworthy."  (Kipp Dep. 72.)  In Willis's version, about three quarters of a mile later, where the dirt road turns to pavement, Cornelius stopped his car and started walking toward Willis's truck.  (Willis Dep. 41.)  Willis testified that he drove his truck in reverse to avoid confronting Cornelius, who returned to his car and continued to drive.  (Willis Dep. 41.)

---

[12] In his deposition, Cornelius said he did not remember whether Johnston was shining a flashlight.  (Cornelius Dep. 81-82.)  There was a flashlight in a pack in his car (Cornelius Dep. 128), and Officer Kipp testified that when asked by Cornelius during the detention, Johnston stated that he had shone a flashlight out of the car window (Kipp Dep. 61).

[13] The different versions of this conversation are materially consistent.

Officer Kipp and the police officers then stopped Cornelius.  Officer Kipp's version of the stop differs from Cornelius's.  Officer Kipp testified that the police officers approached from the rear of Cornelius's vehicle and activated their lights.  (Kipp Dep. 31.) In a statement he earlier wrote out about the incident and read at the deposition, Officer Kipp stated that he pulled in front of Cornelius's car, which was traveling at a "very slow speed," and activated his lights as well.  (Kipp. Dep. 59.)  Willis confirmed that he observed a police car turn around to drive behind Cornelius and turn on its lights, and Officer Kipp's truck pull in front of Cornelius's car "kind of simultaneously."  (Willis Dep. 41-42.)

Officer Kipp acknowledges that during the stop, he pointed his gun at Cornelius in the "ready" position (Kipp Dep. 36),[14] but claims that his weapon was not drawn until after Cornelius was stopped (Kipp Dep. 59-60).[15]  Officer Kipp observed that Cornelius "appeared to be fumbling with something below [Officer Kipp's] line of sight," and based upon that, and his experience, Officer Kipp suspected Cornelius of having a weapon.  (Kipp Dep. 59.) Officer Kipp then exited his vehicle and ordered Cornelius to put his hands where Officer Kipp could see them.  (Kipp Dep. 59.)  Officer Kipp claims that Cornelius's hands were not on the steering wheel.  (Kipp Dep. 41.)  Cornelius "continued to fumble and started to

---

[14] Cornelius testified that Officer Kipp was not the one who pointed the gun at him.  (Cornelius Dep. 100.)  Officer Kipp's exposure to liability, however, is heightened if he was the one who pointed the gun at Cornelius (or if he ordered another officer to point the gun), so for the purpose of viewing the facts in the light most favorable to Cornelius, it will be assumed that he was one of the officers pointing a gun.

[15] Many of the following facts come from the statement Officer Kipp executed earlier and read at his deposition.

quickly exit the vehicle," so Officer Kipp drew his weapon, as did another officer  (Kipp Dep. 60.)  After more orders to put his hands up, Cornelius finally complied.  (Kipp Dep. 60.)  Johnston claims, however, that Cornelius had his hands "up or on the steering wheel" the entire time while they were stopped.  (Johnston Aff. ¶ 10.)

According to Officer Kipp, another officer then handcuffed Cornelius and did a brief pat-down for officer safety.  (Kipp Dep. 60.)  In response to Officer Kipp's questioning, Cornelius stated that he had permission to hunt on the property.  (Kipp Dep. 60.)  Officer Kipp observed through the vehicle window a flashlight in the front compartment and a set of archery equipment in the back compartment.  (Kipp Dep. 61.)  He testified that a more detailed search was not performed because he saw no evidence of illegal night hunting.  (Kipp Dep. 61.)  When Cornelius asked whether he was being arrested, Officer Kipp testified that he answered in the negative and that Cornelius was only being detained to investigate hunting violations.  (Kipp Dep. 61.)  After contacting the lessee's son-in-law, who confirmed that Cornelius had a right to hunt on the property, Officer Kipp released Cornelius.  (Kipp Dep. 61-62.)  In Officer Kipp's estimation, the detention lasted ten minutes.  (Kipp Dep. 61.)

## B.   Procedural Background

Cornelius and other plaintiffs later dismissed from this case (Doc. # 32) filed suit on April 6, 2006.  (Doc. # 1.)[16]  Cornelius filed a Second Amended Complaint on January 9, 2008.  (Doc. # 58.)  The Second Amended Complaint alleges: (1) a 42 U.S.C. § 1983 claim

---

[16] This case has a long procedural history, the details of which are not important for this opinion.

8

of conspiracy to violate rights secured by the Fourth Amendment against Officer Kipp and

Willis;[17] (2) a claim for a violation of Fourth Amendment rights against Officer Kipp; (3)

negligence against Defendant City of Andalusia, Alabama (the "City") ; (4) willfulness

against Willis and Officer Kipp; (5) wantonness against Willis; and (6) wantonness against

Officer Kipp. (Second Am. Compl.)  The claims against the City were later dismissed (Doc.

# 64), as was the substantive Fourth Amendment claim against Officer Kipp (Second Op.

(Doc. # 65)).  Officer Kipp filed a motion for summary judgment on the remaining claims,

but Willis did not, and Cornelius filed no response.  Willis and Cornelius were then directed

by court order to file all evidence with respect to Cornelius's federal claim against Willis for

a *sua sponte* summary judgment ruling on that claim.  (Doc. # 74.)  Willis complied, and also

---

[17]  Count One is interpreted to allege only conspiracy, and not an underlying Fourth Amendment violation as well.  Count One discusses the conspiracy in detail, recognizes that Willis is a private citizen and thus cannot act under color of law (except, as the complaint implies, by conspiracy with a state actor), and does not identify an underlying Fourth Amendment violation directly.  In Count Two, Cornelius alleges an underlying Fourth Amendment violation against Officer Kipp.  (*See* Second Am. Compl. ¶¶ 21-29.)  Officer Kipp and Willis read Count One to cover only conspiracy as well.  (*See* Mot. Summ. J. Br. Kipp 3; Mot. Summ. J. Br. Willis 4-6.)

In Count One, Cornelius also separately alleges a Fourteenth Amendment violation but does not elaborate upon how his Fourteenth Amendment rights were otherwise violated, aside from labeling the violation as one of "due process."  (Second Am. Compl. ¶ 25.)  The Fourth Amendment is incorporated into the Due Process Clause of the Fourteenth Amendment and thus, is enforceable against the states, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), so that could be the reason for the reference to the Fourteenth Amendment, even though it is listed as a separate violation in a separate paragraph.  There is no foundation in the allegations or evidence, however, for an independent Fourteenth Amendment violation.  As the Eleventh Circuit stated in *Hadley v. Guiterrez*, 526 F.3d 1324 (11th Cir. 2008), "[i]t is not [the court's] job to divine a constitutional violation to support [a defendant's] conspiracy claim [under § 1983]."  *Id.* at 1332 (11th Cir. 2008).  The *Hadley* court noted that the plaintiff "wholly failed" to establish a constitutional basis for the conspiracy claim, that the plaintiff's complaint provided no explanation of which rights under the Fourteenth Amendment were protected, and that his brief cited no conspiracy cases.  *Id.* at 1332-33.  This case is similar to *Hadley* in this regard – Cornelius alleged no specific Fourteenth Amendment rights aside from "due process," cited no conspiracy case in his response, and otherwise did not provide support for his Fourteenth Amendment violation as a basis for the conspiracy claim or as a substantive claim.

9

filed a motion for summary judgment with a supporting brief.  Cornelius filed a response to Officer Kipp's motion, but not Willis's.  The evidence Willis and Cornelius filed will be considered for purposes of all the summary judgment motions.[18]

### III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."

---

[18] In other words, Cornelius's response to the *sua sponte* summary judgment order, even though late, will qualify as a response to both motions for summary judgment.  Furthermore, all of the evidence will be considered, and not just the evidence referenced in the motions and briefs, because the evidence was ordered as part of a *sua sponte* summary judgment order.

Rule 56(e)(2).  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).

## IV.  DISCUSSION

### A.    Legal Standard for Cornelius's Federal Claim

To prove a § 1983 conspiracy, "'a plaintiff must show an underlying actual denial of [his] constitutional rights.'" *Hadley v. Guiterrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) (quoting *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1370 (11th Cir. 1998)); *accord Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990).  Additionally, a plaintiff must show that the defendants "reached an understanding to deny the plaintiff's rights." *Hadley*, 526 F.3d at 1332 (citing *Bendiburg*, 909 F.2d at 468).  Private parties can be liable for § 1983 violations if there is an "understanding" or "willful participation" between the private and state defendants.[19] *Bendiburg*, 909 F.2d at 469.

---

[19] There are three distinct tests for determining whether the state action required for a § 1983 action exists: "(1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003). The joint action test applies in this case.  "Nothing more than an 'understanding' and 'willful participation' between private and state defendants is necessary to show the kind of joint action that will subject private parties to § 1983 liability." *Bendiburg*, 909 F.3d at 469.

The conspiracy claim alleges a conspiracy to violate the Fourth Amendment. Cornelius alleges that Officer Kipp and Willis conspired to violate his Fourth Amendment rights in order to "'run off' hunters in the area that [Cornelius] was hunting so as to preserve the wildlife [upon] the property that Willis and [Officer] Kipp hunt game on a regular basis."[20]  (Second Am. Compl. ¶ 23.)  Cornelius accuses Officer Kipp of "point[ing] a deadly weapon at [Cornelius], plac[ing] handcuffs on the person of [Cornelius], arrest[ing] and detain[ing] [him] in an insulting manner without cause or justification," all to further Officer Kipp's interest in protecting game on the land.  (Second Am. Compl. ¶ 24.)  Cornelius also accuses Defendants of using "deadly force" during the arrest.[21]  (Second Am. Compl. ¶ 23.)[22]

"'Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures'. . . .'" *Case v. Eslinger*,   F.3d  , 2009 WL 196842, at *5 (11th Cir. 2009) (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007)).  A traffic stop is a constitutional seizure[23] under the Fourth Amendment if it is

---

[20] Cornelius is suing Officer Kipp in both his official and individual capacities.  (*See* Second Am. Compl. ¶¶ 21-25; Second Op. 3.)  Damages suits under § 1983 against state officers in their official capacities, however, are barred.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see, e.g.*, *Simmons v. Conger*, 86 F.3d 1080, 1085 (11th Cir. 1996).

[21] In his first amended compliant, Cornelius described the use of "deadly force" when he alleged a substantive Fourteenth Amendment violation (Doc. # 16), but in the Second Amended Complaint, he alleges the use of "deadly force" when describing the Fourth Amendment conspiracy violation (Second Am. Compl. ¶ 23).

[22] Officer Kipp raised the qualified immunity defense in his answer to the amended complaint (Doc. # 66, at 3), but did not address it at summary judgment.  Therefore, qualified immunity will not be addressed for purposes of resolving Officer Kipp's summary judgment motion.

[23] "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth Amendments]."  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979);

"justified by reasonable suspicion in accordance with *Terry [v. Ohio*, 392 U.S. 1 (1968)]."
*United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir.) (per curiam), *cert. denied*, 129 S.
Ct. 569 (2008).[24]   *Terry* allows a "brief investigatory stop" of an individual if it is justified
by a "'reasonable, articulable suspicion based on objective facts that' an individual is
engaged in criminal activity."[25]   *Harris*, 526 F.3d at 1337 (citing *Terry*, 392 U.S. 1, and
quoting *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)).   According to this
logic, law enforcement officers may also conduct a stop of a moving car "based on a
reasonable suspicion that its occupants are violating the law."   *United States v. Diaz-
Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993).

It is not necessary, however, that the officer involved in the stop "'actually and
subjectively had the pertinent reasonable suspicion.'"   *Harris*, 526 F.3d at 1338 (quoting
*United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam)).   The standard
is whether "'given the circumstances, reasonable suspicion *objectively* existed to justify [the
investigatory stop].'"   *Id.* (emphasis added) (alteration in original) (quoting *Nunez*, 455 F.3d

---

see also *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009) ("For the duration of a traffic stop . . . a police
officer effectively seizes 'everyone in the vehicle,' the driver and all passengers." (quoting *Brendlin v.
California*, 551 U.S. 249, 255 (2007))).   Also, a roadblock crossing both lanes of traffic that stops a
driver is a "seizure" within the Fourth Amendment.   *Brower v. County of Inyo*, 489 U.S. 593, 598-99
(1989).

[24] The traffic stop also would be justified if there was probable cause that a traffic violation had
occurred.   *Harris*, 526 F.3d at 1337.

[25] Reasonable suspicion "'is a less demanding standard than probable cause and requires a
showing considerably less than preponderance of the evidence.'"   *United States v. Lindsey*, 482 F.3d
1285, 1290 (11th Cir.) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)), *cert. denied*, 128 S. Ct.
438 (2007).

at 1226).  In determining whether the requisite suspicion existed to justify the stop, courts "view the totality of the circumstances in the light of the officers' special training and experience."  *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000).

The reasonableness of an investigative stop depends not only on whether the action was justified, but also on "'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'"  *United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006) (quoting *Terry*, 392 U.S. at 19-20).  In other words, the stop must be both justified by a reasonable suspicion as laid out in *Terry and* carried out in a reasonable manner.  *E.g.*, *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) ("[I]t is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out.").

A claim of excessive or deadly force used during a seizure is analyzed under an "'objective reasonableness'" standard.  *Scott v. Harris*, 550 U.S. 372, 381 (2007).  "The Fourth Amendment provides the right to be free from excessive force in the course of an investigatory stop."  *Sharp v. Fisher*, 532 F.3d 1180, 1183 (11th Cir. 2008) (per curiam). "'[T]he right to make an . . . investigatory stop,'" however, "'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it,'" as long as the force is "'reasonably proportionate to the need for that force.'"  *Galvez v. Bruce*, 552 F.3d 1238, 1242-43 (11th Cir. 2008) (quoting *Lee v. Farraro*, 284 F.3d 1188, 1197, 1198 (11th Cir. 2002)).  An "unreasonable quantum of force" is one that is a "non-*de minimis* force unreasonably disproportionate to the need . . . in effecting an otherwise lawful [stop]."

14

*Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006) (first alteration added).  Whether the use of force was reasonable "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Crenshaw v. Lister*,    F.3d    , 2009 WL 279812, at *6 (11th Cir. 2009) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The analysis "requires careful attention to the facts and circumstances of each particular case."  *Id.* (quoting *Graham*, 490 U.S. at 396).

Police action that exceeds the scope of an investigatory stop and becomes a full-blown arrest is unconstitutional if there is no probable cause to suspect criminal activity at the time of the transition.  *Beck v. Ohio*, 379 U.S. 98 (1964) ("Whether [an] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it . . . .");  *see Street*, 472 F.3d at 1304-07 (providing an example of the different levels of justification needed for a *Terry* stop and one for probable cause).  The Eleventh Circuit has identified four factors that contribute to whether an investigative stop has become a full-blown arrest[26]: "(1) the law enforcement purpose served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the investigation; and (4) the duration of the detention."  *Id.* at 1306 (quoting *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988)).  Determining whether and when a stop became an arrest requires balancing those factors, with a "focus on 'whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions

---

[26] These factors are nonexclusive.  *Street*, 472 F.3d at 1306.

15

quickly, during which time it was necessary to detain the [suspect].'" *Id.* (quoting *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004)).

The test is not one of "'rigid time limitations'" or "'bright line rules,'" but of "'common sense and ordinary human experience.'" *Hardy*, 855 F.2d at 759 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). In *Diaz-Lizaraza*, the Eleventh Circuit noted that an investigatory stop does not become an arrest "merely because the agents drew their guns and patted [the suspect] down after he exited his [vehicle] and made a move toward his hip." 981 F.2d at 1221. If the nature of the suspected activity justifies concern for violence, drawing weapons is a "reasonable way for the agents to protect themselves from a possible concealed weapon." *Id.* (noting that drug dealing is "known to be extremely violent"); *see also United States v. Hastamorir*, 881 F.2d 1551, 1554, 1557 (11th Cir. 1989) (finding no violation when officers pointed guns at and handcuffed defendants suspected for drug dealing and within feet of the officers because officers held a reasonable belief that suspects presented a potential threat to their safety); *United States v. Roper*, 702 F.2d 984, 988 (11th Cir. 1983) (holding that an officer did not act unreasonably during an investigative stop when he drew his gun as he was alone approaching a vehicle with two adult males inside, one of whom was possibly a federal fugitive). Also, "neither handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause." *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985); *see also Hastamorir*, 881 F.2d at 1554, 1557 (described *supra*). *See also Acosta*, 363 F.3d at 1147 ("[A]n investigatory stop

16

does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down to the ground, or secures a suspect in the back of a patrol car." (citations omitted)).

**B.     The Alleged Conspiracy to Violate the Fourth Amendment**

Viewing the facts in the light most favorable to Cornelius, there was no conspiracy between Officer Kipp and Willis to violate Cornelius's Fourth Amendment rights. Putting aside the question of whether Cornelius has presented sufficient evidence that there was an understanding between Defendants to violate his rights, there was no underlying constitutional violation. Willis was a friend of Officer Kipp's and had reported other types of suspicious activity in the area on previous occasions. He called with information about potentially criminal activity that he was in the process of observing. *See United States v. Petty*, 601 F.2d 883, 888 (5th Cir. 1979) (crediting the phone call from an officer's friend who had provided aid on prior occasions as part of evidence that justified a reasonable suspicion).[27] Willis provided Officer Kipp not only with markers to identify the suspect but also predictive information about the suspect's motions – that Cornelius was driving from the place where the criminal activity occurred. Plus, Willis was predicting the presence of and the movement of a car on a road that is not a bustling thoroughfare or a major artery, but is only dirt at the point where the hunting property was located. (Cornelius Dep. 93-94.) Additionally, the car was traveling on the road before the full deer hunting season had

---

[27] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981).

started.[28]  *See Petty*, 601 F.2d at 889-89 (finding that the presence of a passenger car, albeit at odd hours in the day, traveling when it was not hunting season, on a road which has little use except during hunting season, and was rugged terrain, in an area where families along the road know each other, and that had no signs indicating the road leads to other highways, was "inherently more suspicious" than cars on highways).

The fact that Officer Kipp knew Willis personally and that Officer Kipp provided verifiable and verified information speaks to the ultimate question of whether the tip was reliable.  A tip from a known person, if that source is credible, is more reliable than a tip from an anonymous caller.  Officer Kipp testified that he took Willis's statements to be trustworthy, and Cornelius has provided no evidence that Willis was not a reliable source of information for Officer Kipp.[29]  Additionally, the predictive information Willis provided was verifiable and verified.[30]

---

[28] Cornelius stated that it was bow hunting season, but not yet hunting season for guns. (Cornelius Dep. 79-80.)  Willis testified that it was prior to hunting season, but on that weekend, it was permissible to take a child hunting with firearms.  (Willis Dep. 21-22.)  Willis had taken his son hunting that day.  (Willis Dep. 21-22.)

[29] There is no evidence that Willis was not reliable.  There is no evidence that he falsely reported crimes in the past, that he had an unreliable reputation in the community, or that he was not in a position to make the personal observations he was reporting.  Plus, the only evidence that his motives were suspect is his making the calls to Officer Kipp.  Cornelius alleges that Officer Kipp and Willis conspired to violate his rights for their personal benefit.  Though this allegation goes to not only whether an agreement existed but also Officer Kipp's motive for the stop, if Officer Kipp's stop was constitutional from an objective point of view, it was constitutional whether or not Officer Kipp and Willis actualy conspired to stop Cornelius for their personal benefit.

[30] "The requisite reliability of a tip sufficient to support suspicion . . . has to be satisfied in one of two ways.  Either the tip must come from a '*known informant* whose reputation can be assessed and who can be held responsible if [his] allegations turn out to be fabricated[,]' [o]r the content of the tip must include accurate *predictive* information *which is verified* by the subsequent observations of the detaining officer."  *Lindsey*, 482 F.3d at 1285 (emphasis in original) (citations omitted) (quoting *Florida v. J.L.*,

Because Willis's information was reliable, it justified a reasonable suspicion of illegal night hunting or poaching.  Willis told Officer Kipp that he noticed an unfamiliar car on the hunting property, with a light shining out of the car, and that the driver said he had been hunting.  Even Cornelius acknowledges that when he picked up Johnston, it was "real close to dark," dark enough for his headlights to be turned on.  (Cornelius Dep. 81.)  Thus, at the time Officer Kipp stopped Cornelius, Officer Kipp had information that: an unfamiliar car driving on a road back into town had driven onto private hunting property, and had exited again when it was dark enough for headlights, with a flashlight shining from the car window.  Furthermore, Officer Kipp testified that the area was known for "drinking and driving, illegal drug use, drive-through, weapons being discharged on a public road, [and] litter being dumped."  (Kipp Dep. 37-38.)  Stopping Cornelius based on an inchoate suspicion of committing crimes generally would not be sufficient to justify the stop, but the area's negative reputation affects how a reasonable officer would interpret the other information.

---

529 U.S. 266, 270, 271 (2000)) (discussing, however, the reliability of a tip that a crime is *about* to be committed).  "[R]equiring either that the informant be known and reliable from past dealings, or that the tipster, if anonymous, provide predictive future behavior, guards against the unwitting misuse of the police power."  *Id.* at 1296.  A known informant is a person whose tip is reliable because of the informant's "past delivery of accurate information," *id.* at 1295; known informants can be held accountable for providing misleading information, *id.* at 1296.

Though Willis is a variation of a known informant as defined by these terms, he does not fit perfectly under either standard – for a known informant or for an unknown informant providing verified predictive information – but stands somewhere between the two.  The fact that Willis provided information that the suspect may have been committing a crime and predicted his movements, which were then verified by the police, however, contributes to the reliability of his comments.  *See Lindsey*, 483 F.3d at 1297 (describing *J.L.*, 529 U.S. at 270-72).  Given that Willis has provided some predictive information and that Officer Kipp knew him personally, Willis's tip is reliable.

Thus, the information Willis provided is enough, under an objective standard, for a reasonable, articulable suspicion that someone was illegally night hunting or poaching. If an unfamiliar car enters and exits private hunting property in the evening hours, out of full hunting season, and there is a flashlight shining out of the car window, that justifies an objectively reasonable suspicion that someone is on that property to hunt deer at night, which is illegal regardless of whether the hunter has a right to be on the land. The information also justifies an objectively reasonable suspicion of poaching. Whether those suspicions were Officer Kipp's *actual suspicions* is an irrelevant inquiry.

The manner in which Cornelius was stopped was also reasonable. Cornelius claims that he was stopped by a roadblock. Cornelius did not try to avoid the roadblock. The roadblock was neither sudden nor concealed. The roadblock was not designed to cause a car fleeing the police to stop. *Cf. Beshers v. Harrison*, 495 F.3d 1260, 1269 (11th Cir. 2007) (describing as deadly force a roadblock set up by the police who placed a police vehicle right in the truck's path as the suspect was fleeing, causing it to swerve, and noting that it was the police car's maneuver *and* defendant's being forced to brake and swerve that constituted "deadly force").

The roadblock was nevertheless a seizure. In *Brower v. County of Inyo*, 489 U.S. 593 (1989), the Supreme Court refused to distinguish for purposes of determining a "seizure" between a "roadblock that is designed to give the oncoming driver the option of a voluntary stop (*e.g.*, one at the end of a long straightaway), and a roadblock that is designed precisely

to produce a collision (*e.g.*, one located just around a bend)." *Id.* at 598.  The Court was careful to point out, however, that its finding "[was] not to say that the precise character of the roadblock is irrelevant to further issues in the case," namely whether the seizure was unreasonable.  *Id.* at 599.  The Court noted that in the case before it, the unreasonableness of the seizure hinged upon the roadblock's setup, which was "in such manner as to be likely to kill [the suspect]."  *Id.*  The Court specifically stated that "headlights were used to blind the oncoming driver."  *Id.*  The roadblock involved an eighteen-wheel tractor-trailer in both lanes of a two-lane highway in the suspect's path and was "effectively concealed" behind a curve and unilluminated, and there was a police car with its headlights on to blind the suspect on his approach.  *Id.* at 594.  The Court differentiated this roadblock from a scenario where a driver had the opportunity to voluntarily stop at a roadblock, but negligently or intentionally drove into it, in which case, the Court noted, the police would not be liable for any ensuing death.  *Id.* at 599.

The roadblock in *Brower* was markedly different and more dangerous than the one alleged here.  There is no indication that the roadblock Cornelius faced was after a bend in the road, or that the law enforcement officers used any means to cause Cornelius to crash. *See Seekamp v. Michaud*, 109 F.3d 802, 807 (1st Cir. 1997) (similarly distinguishing in its reasonableness analysis a roadblock from that in *Brower*).  Cornelius testified that the police cars were facing him with their blue lights flashing and headlights on when he came upon

the roadblock. (Cornelius Dep. 115-16.) Thus, even though the seizure commenced at the roadblock, it is no less justified, and was not unreasonable in its execution.

The physical coercion used during the stop was also objectively reasonable. Officer Kipp testified that he observed Cornelius fumbling with something out of Officer Kipp's sight line. This observation and Cornelius's quick exit made Officer Kipp suspicious, based upon his training and experience, that Cornelius had a weapon. Johnston claims that Cornelius had his hands "up" or on the steering wheel the entire time, but Johnston's affidavit says nothing about whether *his* hands were up. Officer Kipp did not recall either party putting his hands up (Kipp Dep. 46) and testified that he yelled "get your hands up" as an order directed at the vehicle (Kipp Dep. 45-46). Thus, even if the facts are viewed in the light most favorable to Cornelius, they do not contradict Officer Kipp's testimony that the car's occupants were not complying with orders.[31]

Assuming, however, that Cornelius's hands were visible and he was complying with orders, if Cornelius began a quick exit of the vehicle, that would have justified drawing the weapon, given the nature of the suspected activity. Even if, however, Cornelius's exiting the car had nothing to do with pointing the weapons,[32] whichever officer had the gun pointed in Cornelius's direction did not unreasonably draw the weapon. The nature of the crimes that

---

[31] Incidentally, law enforcement officers "may as a matter of course order a driver of a lawfully stopped car to exit his vehicle." *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam)).

[32] Cornelius claims that a gun was pointed at the car window, which must have been before or as he exited the car.

Cornelius was suspected of committing, that it was nighttime, that the stop was in a rural location, and that there were two male suspects in the car all justify drawing weapons. Indeed, even if Cornelius did *nothing* additionally to raise Officer Kipp's suspicions, the fact that night hunting and poaching involve weapons and that a suspicion of either offense was reasonably justified, the drawing of weapons did not transform the stop into an arrest, especially given the time of day and the fact there were two male suspects in the car.

Nor does handcuffing change the analysis. Officers are permitted to take protective measures for their safety. Handcuffing does not transform an investigatory stop into an arrest if the handcuffing was reasonable under the circumstances. Again, illegal night hunting and poaching are crimes that involve weapons. Cornelius was within reach of the car and it was unclear whether he had a weapon. Officer Kipp could have patted down Cornelius instead, but considering that another passenger was present, Cornelius's proximity to the car, the nature of the crimes suspected, the fact that it was nighttime, and the pace at which the situation unfolded, it was not unreasonable for Officer Kipp to briefly detain Cornelius, especially considering that he assured Cornelius that he was only being detained, not arrested.[33]

Also, the force Officer Kipp used to handcuff Cornelius – laying him over the trunk and leaving him there for what Cornelius said was "long enough" but not "very long" (Cornelius Dep. 120) – was *de minimis* and not excessive. In *Durruthy v. Pastor*, 351 F.3d

---

[33] For the same reason, handcuffing Cornelius was not excessive force as there was the requisite justification for the force.

1080 (11th Cir. 2003), the Eleventh Circuit held that the officer's forcing the defendant to the ground and placing him in handcuffs was *de minimis* force, even assuming it was unnecessary. *Id.* at 1094. The court also found that the physical restraint and handcuffing were lawful. *Id.* In another case, the Eleventh Circuit held that handcuffing a suspect too tightly and too long was *de minimis* force. *Vinyard v. Wilson*, 311 F.3d 1340, 1348 n.13 (11th Cir. 2002) (interpreting *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (per curiam), which is less clear, however, about whether that holding satisfies the constitutional violation or "clearly established" prong of qualified immunity). "'[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.'" *Durruthy*, 351 F.3d at 1094 (quoting *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000)). In short, in light of the following authorities, leaning Cornelius over the trunk and handcuffing him for a short time was not excessive force.

The focus for determining whether an investigative stop became an arrest is "'whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Street*, 472 F.3d at 1306 (quoting *Acosta*, 363 F.3d at 1147). The purpose of the detention, as discussed, was valid. Officer Kipp diligently pursued that purpose by immediately pulling aside the

suspect, checking the car for evidence of illegal night hunting,[34] and following up on

Cornelius's protestations that he had a right to hunt on the land.[35]

After detaining Cornelius, some of the officers performed a search that, based upon

the details of Cornelius's observations, focused only on finding weapons for hunting.  In

*Michigan v. Long*, 463 U.S. 1032 (1986), the Court articulated the scope that a search during

a *Terry* stop can reach:

> Our past cases indicate then that protection of police and others can justify
> protective searches when police have a reasonable belief that the suspect poses
> a danger, that roadside encounters between police and suspects are especially
> hazardous, and that danger may arise from the possible presence of weapons
> in the area surrounding a suspect.  These principles compel our conclusion that
> the search of the passenger compartment of an automobile, limited to those
> areas in which a weapon may be placed or hidden, is permissible if the police
> officer possesses a reasonable belief based on "specific and articulable facts
> which, taken together with the rational inferences from those facts, reasonably
> warrant" the officers in believing that the suspect is dangerous and the suspect
> may gain immediate control of weapons.  "[T]he issue is whether a reasonably
> prudent man in the circumstances would be warranted in the belief that his

---

[34] Cornelius has not alleged sufficient evidence to move forward at summary judgment that the stop was immeasurably extended, or generally too long.  His off-hand comment that the stop may have been two hours is not credible when considered in the context of the rest of his testimony, immediately proceeding, that the stop lasted fifteen to twenty minutes.  He also followed the comment that the stop lasted two hours by noting he was not honestly sure how long the stop lasted.

[35] Even if the stop was justified for suspicion of illegal night hunting only, that Officer Kipp discussed information relevant to poaching with Cornelius does not change the legality of the stop. Police questioning during a detention on matters separate from the basis of the detention does not constitute a "seizure" and cannot be the basis for a Fourth Amendment violation, so long as that questioning does not "measurably extend the stop's duration."  *Arizona*, 129 S. Ct. at 788 (citing *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005)) (noting also that "[n]othing occurred . . . that would have conveyed to [the suspect] that, prior to the frisk, the traffic stop [which was the basis for detention in that case] had ended or that he was otherwise free 'to depart without police permission,'" *id.* (quoting *Brendlin*, 551 U.S. at 257)).

safety or that of others was in danger."  If a suspect is "dangerous," he is no less dangerous simply because he is not arrested.

*Id.* at 1049-1050 (citations and footnote omitted); *accord Riley v. City of Montgomery, Ala.*, 104 F.3d 1247, 1250-51 (11th Cir. 1997) ("A warrantless weapons search of a suspect and his car, pursuant to a limited detention, does not violate the Fourth Amendment if the police have reasonable articulable suspicion to justify such a limited detention. . . . [T]he police are entitled to search the passenger compartment of the detainee's vehicle for weapons.").  The search did not exceed the scope required to assuage that danger.  Cornelius noted that the police did not search the trunk or glove compartment and did not rummage through the car.[36]  These facts signal that the search was done, at least in part, for protective purposes.  Therefore, the scope was appropriately limited.[37]

Because Officer Kipp's investigatory stop of Cornelius was justified, did not transform into a full-blown seizure, and was reasonably carried out, without using excessive

---

[36] It is not even clear that Officer Kipp was part of or directed the search.

[37] Cornelius is not clear on whether the search occurred before or after he was allegedly handcuffed.  However, even though Cornelius's and Johnston's accounts differ on whether Johnston was ordered out of the car, neither claims that Johnston was handcuffed.  Thus, one suspect was still free.  When a suspect is detained, the police may search the areas of the car where the suspect has immediate control if the suspect poses a danger, *e.g.*, upon reentering the vehicle.  *Long*, 463 U.S. at 1050.  In *Long*, the area was rural, the stop was at night, and the police had seen a long knife in the car.  *Id.*  Though the suspect in *Long* had appeared intoxicated, he was not suspected, as Cornelius and Johnston were, of crimes involving weapons.  *See id.*

Also, for searches incident to arrest, which though more expansive, are limited to, like the search discussed in *Michigan* for *Terry* stops, the "immediate" grasp area of the suspect, those searches may be upheld, under certain circumstances, even when the suspects are handcuffed.  *United States v. Bennett*, F.3d    , 2009 WL 130181, at *3-4 (11th Cir. 2009).  Though handcuffing may make it difficult to reach a weapon, it does not make it impossible.  *Id.* at *4.  The same logic applies here, where "[a] suspect has a leg up on agents . . . because he knows where hidden weapons can be found, and that advantage could aid even a restrained person in reaching a weapon before agents can react."  *Id.*

force, and because the search was also justified and appropriately limited, summary judgment is due to be granted on the federal claim against Officer Kipp and Willis.

**C.     Supplemental State-Law Claims**

A district court may decline to exercise supplemental jurisdiction over state-law claims if it has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  For that reason, the state-law claims are due to be dismissed.

## V.  CONCLUSION

Accordingly, it is ORDERED that:

(1)     Officer Kipp's motion for summary judgment (Doc. # 71) is GRANTED as to the § 1983 conspiracy claim in Count One against Officer Kipp (Second Am. Compl.).  The motion otherwise is DENIED as moot.

(2)     Willis's motion for summary judgment (Doc. # 79) is GRANTED as to the § 1983 conspiracy claim in Count One against Willis (Second Am. Compl.).  The motion otherwise is DENIED as moot.

(3)     The remaining claims, which are brought under state law, are DISMISSED pursuant to 28 U.S.C. § 1367(c)(3).

An appropriate judgment will be entered.

DONE this 26th day of February, 2009.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE